UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 14-24255-CV-GAYLES/TURNOFF

OFELIA PITALUGA,

      Plaintiff,

vs.

CAROLYN COLVIN, Acting
Commissioner of Social Security
Administration,

      Defendant,

_____/

## REPORT AND RECOMMENDATION

    **THIS CAUSE** is before the Court upon Plaintiff Ofelia Pitaluga ("Claimant's") Motion for

Summary Judgment **(ECF No. 15)**, Defendant's Motion for Summary Judgment **(ECF No. 16)**, and

a prior Order of Referral entered by the Honorable Darrin P. Gayles.  Upon review of the Motions,

the Responses, the court file, and being otherwise duly advised in the premises, the undersigned

makes the following findings.

## Background

    Claimant submitted her application for disability benefits on November 2, 2009, alleging a

disability onset date of October 1, 2009.  ( Tr[1]. 77).  An application for Supplemental Security

Income ("SSI") was filed on November 16, 2009.  That application alleges a disability onset date of

November 1, 2009. **(Tr. 232-42)**.  Both were denied initially, and upon reconsideration.  Following

a hearing, on August 10, 2011, an unfavorable decision was entered on September 16, 2011.   **(Tr.**

---

    [1]For purposes of this Report and Recommendation, all references to the administrative
record shall be cited as "Tr."  The administrative record is located at **(ECF No. 12)**.

**89)**.  Thereafter, the Appeals Council vacated that decision and remanded the matter back for another hearing.  **(Tr. 115)**.      The Appeals Council directed the ALJ to do the following:

> [G]ive further consideration to the claimant's maximum residual functional capacity ("RFC") during the entire period at issue, and provide rationale with specific references to the evidence of record in support of assessed limitations.  Further develop the information regarding the claimant's employment history and assess in more detail the physical and mental requirements of the jobs that meet the regulatory definition of past relevant work, then compare the claimant's established residual functional capacity with the requirements of her past relevant work as required by the regulations.  If needed and available, to obtain evidence from a psychiatric medical expert and obtain supplemental evidence from a vocational expert to determine whether the claimant has acquired any skills that are transferable with very little, if any, vocational adjustment to other occupations under the guidelines in Social Security Ruling 82-41.  Offer the claimant an opportunity for a hearing, and take any further action needed to complete the administrative record and issue a recommended decision.

**(Tr. 17)**.

Upon remand, the matter was assigned to another ALJ, Lornette Reynolds, who held a hearing on March 4, 2013.  **(Tr. 39)**.  Claimant appeared with her counsel, and testified at the hearing.  Id. Impartial vocational expert Lisa J. Goudy also testified.  Id.  Following the hearing, an unfavorable decision was issued on May 24, 2013**.  (Tr. 17-32)**.    Claimant requested additional review by the Appeals Council.  Same was denied.  **(Tr. 1-5)**.  This action followed.

Claimant was fifty-six (56) years old at the time of her alleged onset.  She was sixty (60) years old on the date of the ALJ's decision.  **(Tr. 11-38)**.   She has some level of college education.  She claims that she is unable to communicate in English.  **(Tr. 88)**.  She has past relevant work as a property manager.  (**Tr. 45-46)**.    Claimant claims disability due to, among other things, schizophrenic disorder, major depressive disorder, generalized anxiety disorder, bulging lumbar discs, hypertension, diabetes, sleeping problems, and obesity. **(ECF No. 239. 288)**.

**<u>Medical Evidence</u>**

*Consultative Examiners*

**<u>Dr. Elias Fernandez</u>**

Claimant was evaluated by Dr. Fernandez on January 11, 2010.  **(Tr. 414)**.    The doctor observed that she was oriented as to person, place, situation and time.  **(Tr. 415)**.  Her thinking was logical and coherent. <u>Id.</u>  Her demeanor was anxious, sad and nervous.  Her speech was observed as spontaneous, coherent, of average volume and vocabulary. <u>Id.</u>    She stated that she goes days without bathing and neglects her grooming. <u>Id.</u>

She reported leaving her job when she separated from her husband. **(Tr. 414)**.  She currently lives in low income housing, does light chores, and occasionally cleans apartments and/or washes clothes for others.  <u>Id.</u>  She also indicated that she tried to find work, but had difficulties due to the economy and a past incarceration.  <u>Id.</u>  She perceives that those issues significantly impede her chances of finding employment.  <u>Id.</u>

 Dr. Fernandez diagnosed her with:   (1) generalized anxiety disorder; major depressive disorder, recurrent; (2) deferred; (3) HTN and history of MI, and lower back problems per history; (4) mood and medical problems.  **(Tr. 416)**.   In his opinion, she socially isolates herself.  He also found that she has mild problems with her focus that are associated with her nervousness. <u>Id.</u>  In his view, her problems impact her capacity to deal with stress, as well as maintaining and sustaining her attention and mental persistence.  <u>Id.</u>

**<u>Mark LaPorta</u>**

On January 13, 2010, Claimant underwent a consultative physical examination by Dr. LaPorta.  **(Tr. 420-23)**.   An interpreter was present to assist during the examination.  The doctor

noted that she did not require the use of any ambulatory assistive devices, and that she was able to get on and off of the table without difficulty or assistance. Id. He also noted that she does not limp, can walk on her heels and toes, stoop, squat, and do straight leg raise without limitations. Id. He observed a "markedly exaggerated 'tenderness' over the spine at approximately L3." Id. He also observed "an exaggerated lordosis, which on examination is obviously caused by habitus and posture." Id. In this connection, he concluded that she had "absolutely no limitation of motion." Id.

He also noted that most of her answers to specific questions were vague. In this connection, he observed that she shrugs "although clearly no formal thought disorder is demonstrable..." **(Tr. 420)**. In his view, she did not "exude a sense of depression," but rather, seemed "diffusely angry." **( Tr. 421)**. Her mental status was unremarkable. He concluded that she was an unhappy 56- year old woman "who probably does not recognize the internal and external inconsistencies in her anamnesis. **(Tr. 423)**. He noted that she does not take antidepressants. **(Tr. 420)**.

In sum, he made the following assessment: (1) back pain, multi-factorial with no radiculopathy, no specific motor findings, and a full range of motion; (2) recent lateral wrist "injury" with no known cause; (3) Dystymia, not dsyphoria. No formal thought disorder. "Will not need criteria for major depression based on [the] examination." He found "no physical reason why she should impose any limits on herself." Id.

**Thomas Peele, M.D.**

Dr. Peele, a state agency consultant, reviewed Claimant's records on February 2, 2010. **(Tr. 425)**. Upon review of the records, he determined that she had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations and no environmental

4

limitations.  **(Tr. 423-432)**.   In his opinion, she could occasionally lift/carry up to fifty (50) lbs, and frequently lift/carry twenty-five (25) lbs.  She could stand and/or walk with normal breaks for a total of six (6) hours in an eight (8) hour work day, and sit with normal breaks for a total of about six (6) hours in an eight (8) hour workday.  He also found that she could push and/or pull (including operation of hand and/or foot controls) without any limitations.  **(Tr. 426)**.

**J. Patrick Peterson, Ph.D.**

Dr. Peterson, a state agency consultant, reviewed Claimant's records, and completed a Psychiatric Review Technique Form on February 15, 2010.  **(Tr. 433)**.  He noted that she was suffering from "Grief/Bereavement/Adjustment Reaction w/Mixed Emotion[s]." **(Tr. 436)**.  He also noted that she suffers from persistent disturbances of mood or affect.  **(Tr. 440)**.   Dr. Peterson concluded that Claimant had only mild restrictions as to the following:  (1) activities of daily living; (2) maintaining social functioning; and (3) maintaining concentration, persistence or pace**.   (Tr. 443)**.  In doing so, he noted that she had no episodes of decompensation.  Id.  With respect to the criteria in section "C[2]" of the listings (organic mental, schizophrenic, or affective disorders), he

---

[2]To meet Listing 12.04 (affective disorders), a claimant must meet the requirements in both paragraphs A and B, or meet the requirements in paragraph C. See 20 C.F.R. pt. 404, subpt. P, app, §12.04.  Paragraph A requires medically documented persistence, either continuous or intermittent, of a qualifying depressive syndrome, manic syndrome, or bipolar syndrome. Id. at § 12.04(A)(1)-(3). Paragraph B requires that the medically documented persistent syndrome result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. Id. at § 12.04(B). Paragraph C requires a medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support," in addition to one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in "such marginal adjustment" that it is predicted that "even a minimal increase in mental demands or change in the environment" would cause decompensation; or (3) a current history of at least one years' "inability to function outside a highly supportive living arrangement," and an indication that this arrangement needs to be continued.  Id. at § 12.04©.

concluded that the evidence does not establish the presence of the required criteria.  **(Tr. 444)**.

**J. Jacqueline Jaffe, Ph.D.**

Dr. Jaffe, a state agency psychological consultant reviewed Claimant's records on, or about, June 17, 2010.  **(Tr. 472-489)**.  She completed a Mental RFC Assessment and a Psychiatric Review Technique Form.  In the Mental RFC Form, she noted that  Claimant had no significant limitations in the following areas: the ability to remember locations and work-like procedures, the ability to understand, remember and carry out, very short and simple instructions, the ability to perform activities within a schedule, maintain regular attendance,  the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with, or in proximity to, others without being distracted by them, the ability to complete a normal workday/workweek,  and the ability to make simple work-related decisions.  **(Tr.  472-473)**.  She found, however, that Claimant was moderately limited in the ability to maintain attention and concentration for extended periods of time.  **(Tr. 472)**.

With regard to social interaction, she opined that Claimant had no significant limitations in the following: the ability to ask simple questions or request assistance, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with co-workers or peers, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  **(Tr. 473)**.  She did, however, note that Claimant was moderately limited in her ability to interact appropriately with the general public.   Id.

As to adaptation, she found that Claimant had no significant limitations in the following areas:   the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places, and/or use public transportation, and the ability to set realistic goals or

6

make plans independently of others. Id. She did, however, note that Claimant was moderately limited as to the ability to respond appropriately to changes in the work setting. Id. Consistent with the above, Dr. Jaffe concluded that "in the absence of any documentation of current [mental health] treatment and based on her performances at physical and mental [consultative examinations], as well as self-reported [activities of daily living] it appears [that the] claimant is capable of performing at the very least, simple, repetitive tasks, preferably in a low stress working environment." **(Tr. 474)**.

In the Psychiatric Review Technique, she checked off the following categories: affective disorders, and anxiety related disorders. **(Tr. 476)**. In section C, she noted that the following medically determinable impairment was present, but "[did] not precisely satisfy the diagnostic criteria: major depressive disorder, recurrent." **(Tr. 479)**. In section E, she noted the following medically determinable impairment, i.e., generalized anxiety disorder, but indicated that Claimant "[did] not precisely satisfy the criteria." **(Tr. 481)**. Dr. Jaffee found that Claimant would have mild restrictions as to activities of daily living and in maintaining concentration, persistence or pace. Id. She also found that Claimant would have moderate difficulties in maintaining social functioning. **(Tr. 486)**. She found no episodes of decompensation of extended duration. Id. She also concluded that the evidence did not establish the section C criteria. **(Tr. 487)**.

**Beatriz Amador, Psy.D.**

Claimant was evaluated by Dr. Amador upon referral by the Office of Disability Determinations for a general clinical evaluation with mental status and assessment. **(Tr. 525)**. The report indicates that she arrived at the appointment untidy and poorly groomed. **(Tr. 526)**. She was calm, alert, and oriented. Id. Her remote memory was good as to providing background information. However, her fund of information was noted as poor, as was her attention and

concentration. Id.   She was able to perform simple math, but not complex arithmetic.  Id.   Her mood was depressed and her affect was congruent.  **(Tr. 527)**.  Her thought process was relevant, logical and goal oriented.  Id.  She reported audio and visual hallucinations.  Id.  However, there was no evidence of hallucinatory behavior noted during the evaluation.  There was likewise no evidence of delusional thinking.  Id.

Dr. Amador's diagnostic impression was:  major depressive disorder, recurrent, severe, rule out with psychotic features, hypertension, diabetes, back pain and vision problems.  Id.   Her prognosis was noted as fair.  She was advised to follow up with her psychiatrist for treatment and medication management.  Individual counseling was also suggested in order to improve coping skills, problem solving and socialization.  Id.  In Dr. Amador's opinion, Claimant would be capable of managing her funds.   Id.

**Dr. Ubaldo S. Rodriguez**

Claimant underwent an orthopedic consultation with Dr. Rodriguez on September 25, 2012. **(Tr. 532-533)**.  X-rays were taken and she was diagnosed with low back pain. Id.   The doctor also reviewed a 2010 MRI report that found disc bulges at L4-L5 and L5-S1.  **(Tr. 533)**. There is no record of Claimant having returned to this doctor for any further treatment.

*Misc. Records*

**Miami Behavioral Health Center**

Claimant was voluntarily admitted on March 25, 2010 with complaints of depression,  lack of energy, insomnia, suicidal ideations (with no plan), and hopelessness. **(Tr. 449)**.    She was diagnosed with major depressive disorder- recurrent, psychosis, and heart problems.   Id.  The evaluation notes reflect that her symptoms improved and that she successfully completed the

treatment.  Id.   Upon discharge, on March 26, 2010, no hallucinations or suicidal thoughts were noted.  Id.

### Kendall Regional Medical Center

The record contains miscellaneous lab and radiology reports from the Emergency Room at Kendall Medical Center dated December 2008.  **(Tr. 407-413)**.  The findings were mostly normal.  However, her white blood count and her glucose were noted as high.   **(Tr. 408)**.  Her chest x-ray appeared normal.   **(Tr. 413)**.  She also underwent a diagnostic exam to rule out deep vein thrombosis.  No evidence of deep vein thrombosis was found.  **(Tr. 411)**.

### Jackson Memorial Hospital

Claimant was admitted to Jackson Memorial Hospital on April 15, 1999.  **(Tr. 398)**.  She presented with bilateral tubo-ovarian abbesses.  Id.  She underwent an abdominal hysterectomy and was discharged on April 21, 1999.  Id.

*Treating Physicians*

### Nelson Hernandez, M.D.

Claimant began her treatment with Dr. Hernandez in April 2010.  **(Tr. 467)**.   On April 12, 2010, Dr. Hernandez noted that her appearance was disheveled.  **(Tr. 468)**.  However, she was alert and her eye contact and insight were noted as fair.  Her mood was guarded.  Id.   No obsessions or compulsions were observed.  Id.   She complained of depression, hallucinations and persecutory delusions.  **(Tr. 467)**.  On June 14, 2010, she again appeared disheveled.  Her psychomotor activity was listed as retarded.   She looked depressed and anxious.  **(Tr. 470)**.   No suicidal or homicidal thoughts were noted.  Id.

On September 20, 2010, she again appeared depressed.  **(Tr. 471)**.  She reported hearing

voices and feeling hopeless.  Id.  However, she was well groomed and her psychomotor activity was normal.  In this connection, she was alert and her eye contact was noted as fair.  Id.

On October 20, 2010, she appeared depressed, paranoid, and delusional.  She reported feeling hopeless and having hallucinations.  **(Tr. 492)**.  During that visit, Dr. Hernandez completed a Medical Assessment of Ability to do Work-Related Activities Form (Mental).  Id.  He assigned her a rating of "poor" as to:   following work rules, relating to co-workers, dealing with the public, use of judgment, interacting with supervisors, dealing with work stress, functioning independently, maintaining concentration/attention.  Id.  Her ability to understand, remember and carry out complex and non-complex job instructions was noted as poor.   **(Tr. 493)**.  With respect to the ability to make personal adjustments, she was rated as "poor" in the following areas: maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability.  **(Tr. 493)**.  However, she was found to be capable of managing "benefits in [her] own [interest]."  Id.

Claimant was seen again on March 14, 2011.  At that time, she appeared disheveled and depressed.  The doctor noted that she had low self esteem and lacked motivation.  **(Tr. 501)**.  No suicidal or homicidal thoughts were observed.  Id.  Dr. Hernandez completed another Medical Assessment of Ability to Do Work-Related Activities (Mental) on June 2011.   He found her to be paranoid, fearful, impulsive and lacking in motivation. **(Tr. 503)**.  His findings were basically the same as the October 2010 evaluation.  This time, however, he rated her ability to relate to co-workers and function independently as "fair."  Id.  Her ability to maintain her personal appearance was also rated as "fair."  Id.    In December 2010, she was found to be anxious and fearful, but alert and oriented as to person, place and time.  Her speech was slow, but her insight was fair.  **(Tr. 500)**.

Claimant was seen again by Dr. Hernandez on September 22, 2011 for "pharmacological management." **(Tr. 509)**.   The medical records indicate "face to face time spent with patient: 17 minutes." Id.   At the time, Claimant reported feeling depressed.   She claims that she is unable to sleep for more than five (5) hours.  Id.   Her behavior was observed as being tense and needy.  Id.   No suicidal or homicidal thoughts were observed.  Id.   Her short term memory was noted as mildly impaired.  Id.   Her attention/concentration was noted as "mildly impaired [,] but easy to redirect." Id.  She was able to perform simple two digit addition.  Id.  Her insight was again noted as fair.  Id.   The doctor found that she is unable to cope with current life stressors. Id.  However, he indicated that she has a good support system, and that she is willing to participate in treatment.  Id.  She was diagnosed with Schizo-affective type schizophrenia and insomnia due to mental disorder.  **(Tr. 510)**. She was prescribed Ambien, Stelzine, and Ventafaxine Hydrochloride ER.   Id.

Claimant was seen again on January 9, 2012.   At that time, she reported feeling sad, depressed, and unable to sleep and/or concentrate.  **(Tr. 506)**.   She again reported persecutory delusions, and being isolated and withdrawn.  Id.   She was seen again on May 28, 2012.   At that time, another Medical Assessment of Ability to do Work-Related Activities (Mental) was completed. **(Tr. 511)**.   Her ability was rated as "poor" in the following areas:  following work rules, relating to co-workers, dealing with the public, use of judgment, interacting with supervisors, dealing with work stress, functioning independently, and maintaining attention/concentration.   Id.   Her ability to function independently was rated as "fair," as was her ability to carry out simple instructions.   Id. However, she received a  "poor" rating as to the following: understanding, remembering, and carrying out complex and non-complex  job instructions.  **(Tr. 512)**.   She was described as forgetful and easily distracted. Id.   She received a "fair" rating as to maintaining her personal appearance.

11

Id.  In sum, the doctor opined that she suffers from "cognitive deficits," was "unable to do work, [and was] very depressed, sad, and paranoid."  Id.  Nevertheless, he found that she would be able to manage her benefits.  Id.

She visited with Dr. Hernandez again on November 15, 2012.  **(Tr. 551)**.  She presented with complaints of hopelessness and severe insomnia.  Id.  She was found to be paranoid, depressed, and sad.  The doctor noted that she was non-compliant due to lack of insurance coverage.  Id.  She was provided with samples of medication.

### Dr. Jose Noel Gonzalez

Dr. Gonzalez examined Claimant in November 2010.  **(Tr. 496)**.  At that time, he completed a Medical Assessment of Ability to do Work-Related Activities Form (Physical).  Id.  The doctor found that she could occasionally lift and/or carry up to ten (10) lbs, but never more than that weight. Id.  He noted that she could only sit, stand or walk for an hour at a time during an eight (8) hour work day.  **(Tr. 497)**.  He also noted problems with the use of her left hand for simple grasping and fine manipulation.  Id.  He found that she can never balance, stoop, crouch, kneel or crawl**. (Tr. 498)**.  However, she would be able to climb occasionally.  Id.  He also found that she could never perform reaching or handling functions, but could push/pull occasionally.  Id.  The following environmental restrictions were noted:  heights, moving machinery, chemicals, noise, humidity, and fumes**. (Tr. 499)**.

Claimant visited Dr. Gonzalez again on April 18, 2011.  During this visit, she complained that her left eye lid was "dry and crusty."  She also complained of a loose tooth. **(Tr. 515)**.  Upon examination she was found to be well nourished, well developed, and in no acute distress.  She was prescribed  antibiotics for her tooth abscess.  The doctor's notes indicate that "she [requested]

medications for a nephew in Cuba." Id.   He wrote a prescription for Bactroban in the nephew's name.   Id.

Claimant visited Dr. Gonzalez again on July 25, 2011.   The reason for the visit was documented as "refills" and "gaining weight." **(Tr. 516)**.   She also reported back pain, night sweats, difficulty sleeping and fatigue.   Id.   Upon examination, she appeared well nourished and in no acute distress.   Id.   She was diagnosed with Diabetes mellitus (without complication) and unspecified hypertension.   Id.   Her next visit with Dr. Gonzalez was January 9, 2012.   **(Tr. 518)**. She complained of severe epigastric pain, and a rash.   Id.   She again reported difficulty sleeping.   Her vital signs were within normal limits, and she was in no acute distress.   She was found to be morbidly obese, and was diagnosed with candidiasis and acute gastritis.   Id.

She visited Dr. Gonzalez again on March 5, 2012.   She reported weakness and depression.   **(Tr. 520)**.   She appeared disheveled.   However,  she was found to be in no acute distress, and was oriented as to person, place, time and purpose.   She was diagnosed with malaise, fatigue, esophageal reflux and major depressive disorder.   Id.   The doctor instructed her to follow up with a psychiatrist.   He opined that "she [was] sliding again into a major depression episode."   **(Tr. 521)**.   She was seen again on July 12, 2012.  This time she complained of swelling in her right elbow. **(Tr. 546)**.   She was observed as being moderately depressed, secondary to pain.   She had difficulty getting on and off of the bed/exam table.   Some inflamation of the right elbow was noted above the lateral malleolus.   Tenderness to palpitation was noted in the right lateral epicondileal groove of the right arm.   **(Tr. 546)**.   She was diagnosed with lumbago, lateral epicondylitis, major depressive disorder, recurrent episode, esophageal reflux, and Diabetes mellitus without complication. **(Tr. 547)**.   She was instructed to apply ice to her elbow and advised to take Ibuprofen.   She was also provided with

samples of Celebrex and Nexium.  <u>Id.</u>  She was again advised to see a psychiatrist.  <u>Id.</u>

### Claimant's Testimony

As indicated above, Claimant testified at the hearing on March 4, 2013.  **(Tr. 41)**.   Her

testimony is as follows.   She was born on May 4, 1963.  **(Tr. 44)**.   She is 5'3, and weighs 200 lbs.

She completed the twelfth grade in Cuba, and also completed some college courses there.  **(Tr. 45)**.

She came to the United States in 1980.  <u>Id.</u>  She is not a U.S. Citizen.   Once in the United States,

she enrolled in some computer classes, in Spanish, but never obtained a certification.  <u>Id.</u>  She last

worked in 2005.  **(Tr. 46)**.   Her last job was as a property manager for Equity Residential Services.

<u>Id.</u>  She worked there for approximately two (2)  years.   Her duties included collecting rent from

the tenants and preparing receipts.  Most of the renters were Spanish speakers.   She was also in

charge of managing tenant complaints and cleaning the apartments.  **(Tr. 48)**.

She lives in a small apartment. She does not have a driver's license.  She relies on her

neighbors to take her to the grocery store.   She uses a patient transportation service to get to her

doctors' appointments.  <u>Id.</u>  Dr. Hernandez is her treating physician.  He treats her for her "nerves."

<u>Id.</u>   She pays a $4 co-payment for her medication.   The medication helps her sleep. **(Tr. 49)**.

She receives $200 per month in food stamps.  <u>Id.</u>

She claims that she stopped working because she was becoming confused at work.   She did

not seek, or obtain, unemployment benefits when she stopped working.  <u>Id.</u>   She also testified that

she had self employment income in 2008.  <u>Id.</u>   During that time, she cleaned apartments for

approximately six (6) to seven (7) months.  <u>Id.</u>

She testified that she sometimes lays in bed the entire day. **(Tr. 50)**.   She has feelings of

worthlessness.  <u>Id.</u>  She cries often.  <u>Id.</u>  She is lonely and has no friends.  <u>Id.</u>  She claims that "no

one wants [her]." **(Tr. 52)**.   She sometimes watches t.v., but is unable to concentrate and/or follow

the program.  **(Tr. 51)**.  She has no interest in reading.  Id.   She is forgetful.  Id.    She only cleans

when her nephew comes to visit.  **(Tr. 52)**.  She is afraid to cook. **(Tr. 53)**. She is able to fry eggs

and cook steak, but most of her meals are prepared in the microwave.  Id.

### Vocational Expert's Testimony

As indicated above, vocational expert, Lisa Goudy (VE), testified at the hearing.  Id.  Ms.

Goudy's services were paid by the Social Security Administration.  **(Tr. 54)**.   There were no

objections to her serving as an expert.   She described Claimant's past relevant work as being a

property or apartment manager from 1999-2005.   Her duties included collecting rent, filling out

forms, and dealing with the residents.  Id.   These duties are listed in the Directory of Occupational

Titles ("DOT") as "apartment manager" Code 186.167-0118, which is classified as light, SVP 5.

**(Tr. 55)**.   She also stated that Claimant had some supervisory responsibilities for more than one

employer.   She explained that Claimant may have been in charge of dispatching the person who

performed the repairs in the apartments.  Id.  In the DOT, this job would be classified as a manager.

Because some of these duties are consistent with supervision, in her view, the occupation is

classified as skilled.  Id.   She also noted that Claimant had some office and computer skills.  Id.

In her view, a command of the English language is required to perform this type of job.  This is

especially true if the client base is English speaking.   **(Tr. 56)**.

The ALJ presented the following hypothetical:

Assume a hypothetical claimant the same age, education and work experience as this
Claimant.  Assume that such a hypothetical claimant were able to occasionally lift 50 pounds
and frequently 25 pounds, could push/pull and carry similar amounts.  Assume that such a
hypothetical claimant were able to stand for one hour at a time and six hours in a workday,
sit for an hour at a time and for six hours in a work day, and walk for an hour at a time and

for six hours in a work day.

*   *   *

Assume no manipulative limitations, no visual limitations, no communicative limitations. Posturally assume the following limitations frequently, ladders, ramps and stairs frequent, balance, stoop, kneel, crouch, crawl frequently.  No ladders, ropes or scaffolds.  Assume no heights, no unprotected heights.  No working at unprotected heights, but can frequently operate moving mechanical parts and ...occasional exposure to heat and humidity. .. [w]ith no other exertional postural limitations.

...Assume that such a hypothetical Claimant were able to understand, remember and carry out short simple instructions, were able to sustain attention and concentration for two-hour periods at a time and for eight hours in a workday, and short two- hour periods at a time and for eight hours in a workday, and short simple instructions.  Assume that such a hypothetical Claimant were able to use judgment in making work decisions related to short simple instructions, required occupation with only occasional co-worker contact and supervision, and occasional interaction with the public.  Assume that such a hypothetical claimant were able to respond appropriately to changes in a routine work setting, maintain regular attendance and be punctual within customary tolerances and perform activities within schedule.

**(Tr. 56)**.

The ALJ asked the VE whether such a hypothetical claimant could perform the instant Claimant's past relevant work.   In the VE's view, the mental demands of the  Claimant's past relevant work exceed her current abilities.  **(Tr. 57)**.  Specifically, she opined that the hypothetical claimant would require unskilled work.   **(Tr. 58)**.  The VE listed certain unskilled jobs that this individual could perform.  For example, in her opinion, this hypothetical claimant could perform an unskilled medium job like a hand-packager, which falls under DOT code 920.587-018, medium, SVP 2, unskilled in the DOT.  The VE testified that there are 10,000 jobs in the Claimant's  tri-county area (Miami-Dade, Broward and Palm Beach); 30,000 in Florida and about 827,000 in the national economy.  **(Tr. 58)**.

She also opined that this person could do work as an industrial janitor, DOT Code 381.687

16

018; medium SVP 2; unskilled, about 25,000 in the regional economy, about 97,000 in Florida, and about 3 million in the national economy.  Id.  The VE was further asked to assume that her abilities to function in these areas were seriously limited, but not precluded.  The ALJ then presented another set of mental limitations, i.e., poor abilities in following:  work rules, relating to co-workers, dealing with the public, use of judgment, interaction with supervisors, dealing with work stress, functioning independently, maintaining attention and concentration, maintaining personal appearance, and behaving in an emotionally stable manner.  **(Tr. 59)**.  Basically, the VE was asked to assume that all categories were "poor" except for a rating of "fair" in functioning independently, and maintaining personal appearance.

In the VE's opinion, such an individual would not be able to perform any of the Claimant's *past* relevant work.  Id.  Initially, the VE testified that this hypothetical claimant could still perform the other work listed above.  However, upon further clarification by the ALJ, the VE concluded that the areas noted as poor were very important, and that she could not identify work for any such person.  The VE further clarified that her testimony as to the hypotheticals 2 and 3 were based on Exhibits 11F and 17 F - which are the RFCs of the treating source.

The VE was also questioned by Claimant's counsel, who presented the following hypothetical:

> Assume that you have a claimant with the same vocational background as the Claimant in this case with the following limitations [from a 2010 consultative evaluation, Ex. 3F].  The claimant is unable to deal with work stresses, unable to maintain and sustain attention, and unable to maintain and sustain persistence in any chore.   Would a person with those limitations alone be able to engage in the Claimant's past relevant work? [Or] any other work?

**(Tr. 61)**.

The VE responded that the individual would not be able to engage in Claimant's past relevant work, or any other work.  Id.  Counsel posed another hypothetical question, this time based on the narrative portion of the second consultative exam (Exh. 19), i.e., the Claimant can only do things when motivated.  In addition, she was asked to assume that her attention and concentration are poor, and her fund of information and judgment are also poor.  In her view, such a person would not be able to engage in the Claimant's past relevant work.  **(Tr. 61)**.

At the conclusion of the hearing, Claimant's counsel summed up his argument by focusing on a consultative evaluation report (3F), and the narrative portion of another (19F).  In sum, counsel argued that the RFC was not in line with the narrative portion of the report.  **(Tr. 61-62)**.

## ALJ's Findings

After the hearing, and upon careful review of the record, the ALJ issued an unfavorable opinion.  In her opinion, she found that Claimant had the following severe impairments:  major depressive disorder, schizoaffective disorder, hypertension, diabetes and disc bulging at 4-L5 and 5-S1.  **(Tr. 20)**.  However, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx 1.  Id.   The ALJ further determined that Claimant has the RFC to perform a limited range of medium work.  Specifically, she found that Claimant can lift, carry, push, and pull fifty (50)  pounds occasionally and twenty-five (25) pounds frequently.  She can stand for an hour at a time and for six (6) hours in an eight (8) hour work day with normal breaks.  **(Tr. 23)**.  The ALJ further found that she is able to frequently climb stairs, balance, stoop, kneel, crouch and crawl, but can never climb ladders, ropes or scaffolds.  She found no established manipulative, visual or communicative limitations.  Id.   She further found that

18

Claimant should never work at unprotected heights or with moving mechanical parts.   Id.

Mentally, she found that Claimant is able to understand, remember and carry out, short simple instructions and sustain attention and concentration for two (2) hour periods at a time for eight (8) hours in a workday, and can use judgment in making decisions in this regard.   She also opined that Claimant requires an occupation with only occasional co-worker contact and supervision. In her view, Claimant is capable of occasional interaction with the public, and is capable of maintaining regular work attendance.   Id.

In sum, the ALJ concluded that Claimant is unable to perform any past relevant work. However, she found that considering her age, education, work experience, and  RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, i.e., hand packager, industrial janitor, and kitchen helper. **(Tr. 30)**.  Accordingly, the ALJ found that Claimant has not been under a disability, as defined by in the Social Security Act, from October 1, 2009, through the date of the opinion.  **(Tr. 31)**.

## Standard of Review

Judicial review of findings of fact in disability cases is limited to:  (1) determining whether the record contains substantial evidence sufficient to support the ALJ's findings, and (2) whether the correct legal standards were applied.   Moore v. Barnhart, 405 F.3d 12058, 1211 (11th Cir. 2005); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). In other words, it is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. Id.   Even if the Court finds that the evidence preponderates against the Commissioner's decision, it must affirm if the decision is supported by substantial evidence.  Levie

v. Comm'r of Soc. Sec., No.  12-12709, 2013 WL 1197082, at *1 (11th Cir. 2013) .

In sum, the court must view the record as a whole, "taking into account evidence favorable as well as unfavorable to the Commissioner's decision." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  In doing so, the court "may not reweigh evidence and decide facts anew, and must defer to the ALJ's decision if it is supported by substantial evidence." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).   This restrictive standard of review applies to findings of fact.  No such presumption of validity as to the conclusions of law made by the Commissioner. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991).

### Sequential Analysis

The Social Security Administration regulations, utilized by the ALJ, provide a five-step sequential evaluation process to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).  In step one, the ALJ determines whether the claimant is engaging in "substantial gainful activity."  Id. at § 404.1520(a)(4)(1).  If an individual engages in substantial gainful activity, he or she is not disabled.  If not, the evaluation continues to the next step.

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments.  Id. at § 404.1520(a)(4)(ii).  If the claimant does not have a medically severe impairment or combination of impairments, he or she is not disabled. Id. If the impairment or combination of impairments is severe, then the evaluation proceeds.

At step three, the ALJ determines whether the claimant's impairment, or combination of impairments, meets or medically equals the criteria of an impairment listed in § 404.1520(d), subpt. P, app. 1. Certain impairments are so severe by nature that, if established, the ALJ must find that the claimant is disabled without further inquiry. Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir.

1985). If the claimant's impairment or combination of impairments meets or medically equals a

listed impairment, the claimant is automatically disabled and the evaluation ceases. § 404.1520(d).

If the claimant's impairment or combination of impairments does not meet these criteria, then the

ALJ assesses the RFC based on all the evidence. § 404.1520(e).

At step four, the ALJ assesses the claimant's RFC and determines if the claimant can perform

his or her past relevant work. § 404.1520(a)(4)(iv). In making this finding, the ALJ must consider

all of the claimant's impairments, including ones that are not severe. § 404.1520(e). Past relevant

work encompasses work performed within the last fifteen years or fifteen years prior to the date that

disability was established. If the claimant is able to perform past relevant work, he or she is not

disabled. Id. If the claimant is unable to perform past relevant work, the evaluation continues. At

step five, the ALJ determines whether the claimant is able to do any other work in the national

economy considering his or her RFC, age, education, and work experience. § 404.1520(a)(4)(v).

The burden is on the claimant to prove that he or she is unable to perform past relevant work

and that the impairment(s) is so severe that he or she cannot engage in any substantial gainful activity

in the national economy. 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A) (2012); Freeman v. Barnhart, 220 F.

App'x 957, 959-60 (11th Cir. 2007). Along these lines, the inability to perform previous work

relates to the type of work performed, not merely to a specific prior job. Jackson v. Bowen, 801 F.3d

1291, 1293 (11th Cir. 1986).

**Plaintiff's Arguments for Reversal**

**(1)    The ALJ Failed to Articulate the Weight she Accorded the Opinions of Drs.
        Fernandez and La Porta**

Claimant argues that despite heavily relying upon the consultative examiners' opinions, the

ALJ "altogether failed to articulate the weight she accorded the opinions of Dr. Elias Fernandez and Dr. Mark La Porta." **(ECF No. 15)**.   The Commissioner concedes that the ALJ failed to explicitly articulate the weight she afforded these opinions.  In the Commissioner's view, however, any such error is harmless, because even if the opinions were accepted, Claimant would still be able to perform the activities listed in the ALJ's RFC.  **(ECF No. 16)**.

As a general matter, an ALJ's failure to indicate with particularity the weight given to a medical opinion is reversible error.  Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987).   The error, however,  may be deemed harmless where the correct application would not contradict the ALJ's ultimate determination.  Caldwell v. Barnhart, No. 07-12595, 2008 WL 60289, at *2 (11th Cir. Jan. 7, 2008) (citing Diorio v. Heckler, 7231 F.2d 726, 728 (11th Cir. 1983)).

In the case of Dr. La Porta, he found "no physical reason why she should impose any limits on herself."  **(Tr. 423)**.   Dr. Fernandez  observed that Claimant was oriented to person, place, situation and time.  **(Tr. 415)**.  Her thinking was logical and coherent. Id.   He opined that Claimant has mild problems with her focus that are associated with her nervousness.  Id.  In his view, her problems impact her capacity to deal with stress as well as maintaining and sustaining her attention and mental persistence.  **(Tr. 416)**.

As noted above, the ALJ determined that Claimant has the RFC to perform a limited range of medium work.  **(Tr. 23)**.  In doing so, she found that Claimant requires an occupation with only occasional co-worker contact and supervision.  She also concluded that she is capable of occasional interaction with the public, and is capable of maintaining regular work attendance.  Id.   In this Court's view, neither opinion would affect Claimant's ability to perform said work.  In other words, these opinions, if accepted, would not have changed the result or the ALJ's findings.

**(2)     The ALJ Failed to Articulate the Weight Accorded to the Treating Source Opinions**

Claimant argues that the ALJ failed to articulate the weight she accorded the entirety of the treating source opinions of Drs. Hernandez and Gonzalez.  **(ECF No. 15)**.   Claimant specifically argues that the ALJ only articulated the weight she accorded to their medical source statements. **(ECF No. 15)**.

Generally, absent good cause, an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." Lewis v. Callahan, 125 F. 3d 1436, 1439 (11th Cir. 1997).  Good cause exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  Winschel v. Comm'r. of Soc. Sec., 631 F. 3d 1176, 1179 (11th  Cir. 2011)(citing Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 1997).

*Dr. Hernandez*

Here, the ALJ provided sufficient reasons for according "less than controlling weight" to the opinion of Dr. Hernandez.  **(Tr. 29)**.  Specifically, the ALJ concluded that this doctor's opinion was inconsistent with the medical evidence, Claimant's activities, and the record as a whole.  Id.   First, the ALJ noted inconsistencies within the doctor's own notes.    Specifically, she found that the doctor's clinical notes, wherein he indicates that Plaintiff suffers from schizoaffective disorder, were inconsistent with his opinion that she suffers from depression.   Further, while some notes reflect a disheveled appearance, others indicate that she was well-groomed and had an appropriate appearance. **(Tr. 471, 500-509)**.  Moreover, several records reflect that Claimant was oriented as to person, place and time, had fair insight, and had logical and concrete thoughts.  Id.  Along these same lines, Dr.

Amador found her to have a relevant, logical and goal oriented thought process.   She observed no evidence of hallucinatory behavior or delusional thinking.  **(Tr. 526, 27)**.

The ALJ also noted that findings regarding Claimant's "poor ability to follow work rules, relate to coworkers, deal with the public, exercise judgment, interact with supervisors, deal with work stress, function independently, and maintain attention and concentration" were inconsistent with her daily activities, and the record.  In so finding, the ALJ noted that Claimant lives independently, does laundry, cleans, and prepares her own meals.  In sum, she handles her own affairs, including her Medicare benefits, food stamps, and medication.  **(Tr.  29)**.  In fact, in at least one report, Dr. Hernandez himself opined that Claimant was capable of managing her benefits.  **(Tr. 512)**.  In sum, the ALJ concluded that Dr. Hernandez "did not offer the kind of treatment one would expect of an individual as limited as opined."  **(Tr. 29)**.  It also bears noting that the ALJ correctly discounted Dr. Hernandez' opinion that Claimant is unable to work, because same is reserved for the Commissioner.

Upon careful consideration, the undersigned finds that the ALJ sufficiently articulated the reasons for according less than controlling weight to this doctor's opinion.

*Dr. Gonzalez*

Claimant also alleges error by the ALJ in that he accorded the opinion of Dr. Gonzalez "less than controlling weight."  **(ECF No. 15)**.  In this connection, Claimant argues that  the ALJ summarized the entirety of Dr. Gonzalez' treatment in just five short sentences. **(Tr. 26)**.   However, upon review, the ALJ memorialized Dr. Gonzalez' treatment in other parts of her opinion.  **(Tr. 25-26)**.  Further, in his findings he makes reference to several pieces of medical evidence, that indicate, among other things, a normal range of motion, which is inconsistent with his findings.  **(Tr. 25-26, 28)**.

24

By way of summary, Dr. Gonzalez opined that Claimant was limited to less than sedentary work. His findings suggest that she can never balance, stoop, crouch, kneel or crawl. **(Tr. 498)**. He also noted that she could never perform reaching or handling functions. In his view, she was limited to sitting, standing and walking for no more than one (1) hour in an eight (8) hour work day. **(Tr. 497)**. However, he did find that she could push/pull and climb occasionally. Id. His treatment records show that she presented with acute conditions such as inflamation in her right elbow, and tenderness in her back. **(Tr. 515-520)**. He prescribed Celebrex, but otherwise gave her conservative treatment, i.e., Lidoderm patches for pain, ice and rest. Id. As correctly noted by Defendant, "these findings do not support a limitation to less than sedentary work." **(ECF No. 16)**.

Further, Dr. Gonzalez' findings are inconsistent with examinations by Drs. La Porta and Rodriguez. As previously indicated, Dr. La Porta found "no physical reason why she should impose any limits on herself." **(Tr. 423)**. In addition, Dr. Rodriguez opined that Claimant had a normal range of motion in her cervical spine, shoulder and elbow. He also noted a normal range of motion in her wrist, hand, hip, knees and ankles. **(Tr. 534-535)**. No muscle spasms were noted **(Tr. 532)**, and he found that she could continuously lift and carry up to ten (10) pounds, and frequently lift and carry up to twenty (20) pounds. **(Tr. 537)**. Of equal importance, he found that she could sit, stand, and walk for a total of six (6) hours in an eight (8) hour work day. **(Tr. 538)**. These findings are more consistent with those of Dr. Peele, the state consultant. **(Tr. 426-32)**.

The ALJ actually makes reference to Dr. Peele's opinion, wherein he found that Claimant had no postural or manipulative limitations. **(Tr. 427)**. In this connection, he found that she could push and pull without limitations. **(Tr. 426)**. In so finding, he concluded that she could lift up to fifty (50) pounds occasionally and twenty-five (25) pounds frequently. Id. He noted that Claimant was

"partially credible," because "[some] allegations exceed objective findings." **(Tr. 430)**.   In short, the undersigned finds that the ALJ provided sufficient reasons for according less weight to this treating physician's opinion.   The undersigned independently finds that same is supported by substantial evidence.

### (3)   The ALJ Failed to Conduct a Proper Credibility Assessment

Claimant argues that the ALJ incorrectly discredited her testimony.   In this connection, she argues that the ALJ attacked her credibility because of a statement she made to a treating source, i.e., that she stopped working due to a move to Miami, rather than disability.  **(ECF No. 12)**.   Along these same lines, she also takes issue with the ALJ having considered a comment that she made to  Dr. Fernandez, i.e., that she was unable to secure work due to a prior incarceration for drugs and the bad economy.   Id.   She further takes issue with the ALJ's noting that despite her testimony that she does not drive, and has never had a driver's license, the record shows that she drove to a consultative examination.   Id.   Lastly, Claimant disputes the ALJ's assertion that Claimant can speak English.

Social Security Ruling 96-7p states that because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone."   In  assessing a claimant's credibility, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529 which include the following:   (1) the individual's daily activities; (2) the frequency, intensity, and duration of the individual's pain or other symptoms; (3) the factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) the treatment, other than medication, that the individual receives or has received for his/her symptoms; (6) any measures other than treatment the individual uses, or has used, to relieve pain or other symptoms; and  (7) any other

factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  See Social Security Ruling 96-7p.

Upon careful review, the undersigned finds that the ALJ considered the proper factors that were of record.  **(Tr. 24)**.  For example, she noted that Claimant makes simple meals and cleans on occasion.  She resides alone and goes shopping locally.  Id.  The ALJ also considered that she takes public transportation and/or relies on her neighbors to get around.  Id.  The ALJ further noted that Claimant receives treatment for depression and acknowledges that her medications "help her a lot." Id.

After considering the record, the ALJ concluded that while Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.  In doing so, the ALJ provided a few examples.  Again, the ALJ makes reference to  a statement by Claimant (to her treating physician )wherein she indicates that she stopped working because she moved from West Palm Beach.  In this connection, she told Dr. Fernandez that she had tried to find work, but was unable to secure a job because she had a prior incarceration for drugs, and because the economy was bad.  This is consistent with her hearing testimony.  **(Tr. 414, 420)**.  In this Court's view, the seeking of employment implies that Claimant was ready, willing, and able to work.

The ALJ also noted other inconsistencies.  For example, Claimant testified that she does not drive and has never held a driver's license.  However, the record (Dr. La Porta) shows that she drove to the consultant's office.  **(Tr. 420)**.  Even assuming that the doctor made that statement in error, the record still supports the ALJ's credibility assessment.  For instance, Claimant contends that she is unable to speak English.  However,  she has lived in the United States for over thirty (30) years.

27

Also, certain clinical notes (Dr. La Porta) imply that she does speak some English.  Specifically, Dr. La Porta noted that she is "moderately bilingual."  **(Tr. 420)**.    Further, the ALJ referred to the VE's testimony wherein she indicates that Claimant's past job typically requires proficiency in English.   **(Tr. 25)**.  Most importantly, the ALJ observed that Claimant often responded to questioning during the hearing prior to the official translation from English to Spanish.  Id.

Claimant's medical records indicate that she suffers from depression, anxiety and related mental issues.  However, as indicated *supra*,  the record does not reflect a complete inability to function.    The same is true as to her alleged physical complaints.  For example, she complains of back pain and a reduced range of motion.  However, the records reflect normal muscle strength and grip, and a normal range of motion in her joints.  As highlighted above, Dr. La Porta  noted that she did not require the use of ambulatory assistive decides, and that she was able to get on an off of the table without difficulty or assistance.  **(Tr. 420-423)**.    He also observed that she does not limp, can walk on her heels and toes, stoop, squat, and straight leg raise without limitations.  In sum, he concluded that she had "absolutely no limitation of motion," and that Claimant had "no physical reason [to] impose any limits on herself."  Id.   For these reasons, among others, the ALJ questioned Claimant's credibility.  In this Court's view, the ALJ sufficiently articulated adequate reasons for doing so.

### (4)    The ALJ's RFC is not Supported by Substantial Evidence

Claimant basically raises two issues as to the RFC.  First, Claimant argues that the ALJ failed to properly evaluate her obesity.  Second, Claimant suggests, among other things, that the ALJ failed to provide a single limitation (apart from a general limitation to unskilled work) that accounts for her own assessed moderate limitations in the area of concentration, persistence or pace.  Defendant, of

course, disagrees.

*Obesity*

Pursuant to SSR 02-1p, an ALJ must consider obesity as an impairment when evaluating disability.  While the ALJ has a duty to make a determination on a claimant's RFC, it is the claimant who bears the ultimate burden.  Sanders v. Astrue, No. 2:10cv996-WC, 2011 WL 5118808, *1 (M.D. Alabama Oct. 28, 2011).   In other words, the Claimant must show that her obesity results in functional limitations and that she is disabled.   See C.F.R. § 404.1512 (a) & ( c).  Here, the ALJ considered her weight.  **(Tr. 21)**.  In doing so,  the ALJ limited her to standing, sitting and walking for an hour at a time.   **(Tr. 23)**.   In sum, she evaluated Claimant's obesity and relied on medical evidence in reaching Claimant's RFC.   As noted above, Dr. La Porta's records reflect normal muscle strength and grip, and a normal range of motion in her joints.  **(Tr. 421-423)**.   Again, the doctor noted that she did not require any ambulatory assistive devices, and that she was able to get on an off of the table without difficulty.  Id.   As previously indicated, he also noted that she does not limp, can walk on her heels and toes, stoop, even squat, and perform straight leg raise without limitations.  Id. Again, he concluded that she had "absolutely no limitation of motion," and that Claimant had no physical reason to impose any limitations on herself.  Id.   Consistent with these findings, Dr. Peele found that Claimant could perform medium work with no postural limitations.  **(Tr. 425-32)**.

Upon review, the undersigned finds that the ALJ properly evaluated  Claimant's obesity. Nothing in the record suggests that any further functional limitations exist that would preclude medium level work.

*Moderate Limitations*

Claimant  suggests  that  the  ALJ  in  this  case  omitted  nearly  all  clinically  significant

29

examination findings from her analysis. **(ECF No. 15)**.  Specifically, Claimant suggests that, at a minimum, the ALJ should have incorporated at least some of the treating source objective evidence of record.  Id.   In short, claimant argues that the ALJ erred by finding that she had psychological impairments that produced moderate difficulties in the ability to sustain concentration, persistence or pace, but failed to explicitly include these limitations in her hypothetical question to the VE.  Id. Defendant disagrees.

Specifically, Defendant argues that the ALJ's RFC finding and hypothetical question accounted for the ALJ's determination that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace.  In this connection, Defendant argues that an ALJ need not explicitly refer to a claimant's moderate difficulties in a hypothetical to the VE if the ALJ:  (1) indicates that medical evidence suggests that the claimant can work despite such a limitation, or (2) otherwise implicitly accounts for the limitation in the hypothetical question.   Winschel, 631 F. 3d at 1180-81.

Indeed, in Jarrett v. Comm'r. of Soc. Sec., No. 10-13911, 2011WL 1378108, *1 (11th Cir. Apr. 11, 2011), the Court confirmed that an ALJ's hypothetical restricting the claimant to simple and routine tasks adequately accounts for restrictions related to concentration, persistence and pace where the medical evidence shows that the claimant retains the ability to perform tasks despite deficiencies in concentration.   Jarrett, 2011 WL 1378108 at *2 (quoting Winschel, 631 F.3d at 1181). Specifically, in Jarrett, the ALJ asked the VE to assume that the claimant could only understand, remember, and carry out simple tasks and concentrate for brief periods of time.  Id. at 871.  There, the Court found that by including a claimant's limitations in her ability to concentrate in the hypothetical to the VE, the ALJ had adequately accounted for his findings that she had moderate

30

difficulties in concentration, persistence and pace.  Id. (citing White v. Comm'r of Soc. Sec., 572 F.3d 272, 288 (6th Cir. 2009)).

As indicated above, the ALJ asked the VE to assume that "[the] Claimant [was] able to understand, remember and carry out short simple instructions, [and] able to sustain attention and concentration for two-hour periods at a time and for eight hours in a workday, and short two- hour periods at a time and for eight hours in a workday, and short simple instructions."  **(Tr. 53-62)**.

Here, for example, Dr. Amador noted that her thought process was relevant, logical and goal oriented despite poor concentration.  **(Tr. 526)**. Her speech was normal and her insight was fair. She was able to perform simple math and her that her immediate memory was noted as good. Id.  Dr. Amador did not assess any marked limitations.  Id.  Dr. Fernandez also observed that Claimant was oriented to person, place, situation and time.  He also found that her thinking was logical and coherent. **(Tr. 415).**   Upon careful review of the medical records summarized above, as well as the relevant testimony,  the undersigned finds that the hypothetical question posed to the VE explicitly, and implicitly, accounted for  Claimant's impairments as to concentration, persistence and/or pace.  Accordingly, in this Court's view, there was no error.

The ultimate burden of proving her disability belongs to Claimant.  Claimant herein failed to meet her burden.  Consistent with the above, the undersigned concludes that the ALJ's findings are supported by substantial record evidence.   Accordingly, it is hereby **RESPECTFULLY RECOMMENDED** that  Plaintiff's  Motion for Summary Judgment **(ECF No.  15 )** be **DENIED**, and  Defendant's Motion for Summary Judgment **(ECF No.  16 )** be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the

31

Honorable Darrin P. Gayles, United States District Judge for the Southern District of Florida.  Failure

to file objections timely shall bar the parties from attacking on appeal the factual findings contained

herein.  Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 1988); R.T.C.

v. Hallmark Builder, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

      **RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida, this 11th  day of

March 2016.

_____
**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:      Hon. Darrin P. Gayles
           Counsel of Record